Filed 5/7/13  In re Christina R. CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re CHRISTINA R., a Person Coming Under the Juvenile Court Law. | B241268<br>(Los Angeles County<br>Super. Ct. No. CK89756) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>PENNY M.,<br><br>Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County.  Debra Losnick, Juvenile Court Referee.  Reversed with directions.

Cameryn Schmidt, under appointment by the Court of Appeal, for Defendant and Appellant.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, and Kim Nemoy, Principal Deputy County Counsel, for Plaintiff and Respondent.

_____

The issue on appeal is whether the California juvenile court had subject matter jurisdiction of custody over the child under the Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA) (Fam. Code, § 3400 et seq.) when it made the jurisdictional findings and disposition order. We conclude that it did not have jurisdiction because the initial custody determination was not made in California, and California did not obtain jurisdiction prior to making the findings and order. We therefore reverse.

## FACTUAL AND PROCEDURAL BACKGROUND

### The Arizona Proceedings

Sixteen-year-old Christina R. (Christina) was born in Arizona in April 1996, after her unmarried parents' brief relationship had ended. In March 1997, the family court in Pima County, Arizona granted her mother, appellant Penny M. (mother), sole legal and primary physical custody of Christina, permitting Christina's father, Matthew E. (father) (who is not a party to this appeal), unmonitored visits. That same year mother and Christina moved to California, and mother married Christopher M. (stepfather) in 1998. Mother and stepfather soon separated and it appears that mother and Christina moved to Texas for a short time during the separation. Mother and stepfather eventually reconciled and resumed living together as a married couple in California, where they resided with Christina uninterrupted since at least 2003.

In 2006, the Arizona court modified its visitation order, allowing father increased visitation with Christina in Arizona.

### The Dependency Petition and Detention in California

In September 2011, the Los Angeles County Department of Children and Family Services (department) detained Christina in foster care and filed a dependency petition on her behalf alleging that stepfather physically and sexually abused her, mother failed to protect her, and mother and stepfather had a history of engaging in domestic violence. The department became involved after Christina disclosed the abuse to neighbors. Mother and stepfather admitted to a single incident of arguing and shoving one another that occurred four years earlier, but denied all other allegations. Mother stated Christina

2

fabricated the allegations because she wanted to live in foster care to have more freedom and was coached by father and the paternal grandmother.

The detention report noted that mother, father and Christina had a prior welfare history in Arizona. Father was still living in Arizona. He and the paternal grandmother drove to California to be interviewed by the department. Father reported that Christina had told him and the paternal grandmother about the abuse, but he did not intervene because when he had made past allegations against stepfather, mother had falsely accused him of abusing Christina; however, no evidence of abuse by father was found. Mother had her own child-welfare history stemming from sexual abuse perpetrated against her and her now-deceased sister by their stepfather, whom mother blamed for her sister's death. Mother was psychiatrically hospitalized after her sister's death.

Mother and father both appeared at the detention hearing and were appointed counsel. The juvenile court found father to be Christina's presumed father and detained Christina in the department's custody.

### Further Investigation

Further interviews revealed that in February 2011, mother suffered a miscarriage after Christina kicked mother in the stomach during a confrontation. Christina felt guilty about mother's miscarriage, was depressed, and reported hearing voices criticizing her. Her foster mother reported that Christina had mood swings, but no problems with aggression. The department arranged for Christina to receive mental-health treatment after she reported having auditory hallucinations. Christina reiterated that she observed ongoing domestic violence between mother and stepfather, which made her feel afraid of and intimidated by stepfather. Although mother expressed sincere concern for Christina's welfare, mother continued to support stepfather even after Christina reported he was sexually inappropriate with her. Mother completed a parenting course.

Father and Christina talked daily. Father wanted Christina to live with him in Arizona, but acknowledged that Christina wanted to stay with mother, whom Christina felt she needed to protect. Father stated he did not believe that mother would leave

3

stepfather: "The only option left, and what I want, is for her (Christina) to come be with me. I realize she'll probably need therapy for this, doctors, and I'll make sure all that occurs. I know she'll probably not be happy with me. The choices are foster care or being with her (Christina) mom and step-dad." Father elaborated that he had not intervened on Christina's behalf because she had begged him not to say anything, and he was afraid she would not corroborate him and that he would lose his visitation rights. Father "had to fight tooth and nail" for visitation with Christina, and he would continue to fight for custody.

Christina reported she was unhappy living with her foster mother, who made Christina feel unsupported and unwanted. The department was searching for another foster home. Since being detained, Christina's grades had slipped from A's and B's to C's and D's. Christina did not want to live with father because she did not know him well. The record shows that Christina visited father in Arizona for five weeks in the summer and alternating holidays.

The department reported that it believed the allegations of physical and sexual abuse, and that stepfather was "overpowering, controlling, and emotionally abusive, placing mother and Christina herself in a position where their feelings and opinions don't matter," and that "some form of abuse is inevitable if the mother and/or Christina don't comply or satisfy the step-father's requests."

At a pretrial resolution conference in October 2011, the department submitted a report to the juvenile court that included the Arizona court's orders.

## Jurisdiction and Disposition

The juvenile court's jurisdictional findings and disposition order were made after lengthy hearings held from February 22 to May 3, 2012. Christina initially testified that the allegations in the dependency petition were true, but later denied the sexual abuse while affirming the domestic violence. She also testified that stepfather had punched her in the stomach, but later stated he was only playing around. Christina wanted to return to mother's custody.

4

Mother maintained the allegations were untrue. She stated that a month before the department's involvement, she found Christina electronically sending naked pictures of herself to boys. According to mother, stepfather had moved out of the house, but she admitted that he still spent the night there on occasion. Mother stated she was willing to divorce stepfather if that were the only way to have Christina returned to her custody.

Stepfather also maintained that the allegations were false and claimed to have moved out of the family home, but he could not recite the address where he was staying.

Christina's former foster mother testified that Christina told her that stepfather had hit her, was sexually inappropriate toward her, and regularly engaged in domestic violence with mother.

Father testified that his relationship with Christina was "excellent" for the amount of time they spent together and that he and Christina "are very, very close." The paternal grandmother testified that she has a "close relationship" with Christina that is "wonderful" and that Christina is a "joy" for the whole family.

Christina's therapist, who provided conjoint sessions between Christina and mother, observed an appropriate mother-daughter relationship.

Mother's therapist was concerned about mother's continual refusal to acknowledge the abuse, but opined that Christina could return to mother's custody with protective services in place. However, the therapist noted mother was very torn between stepfather and Christina.

The juvenile court declared Christina a dependent child under Welfare and Institutions Code section 300, subdivisions (a), (b), and (d), finding true that stepfather had physically and sexually abused Christina, mother failed to protect Christina, and mother and stepfather exposed Christina to domestic violence. The juvenile court struck all references to father from the petition. The juvenile court found father credible, but did not believe mother's or stepfather's testimony, citing many "glaring" inconsistencies. The court was stunned by mother's level of denial, "one of the worst I've heard." The court also disbelieved Christina's recantation of abuse.

5

As to disposition, Christina's attorney asked that Christina not be returned to mother's custody and indicated there was nothing to prevent the court from placing Christina in father's custody, since father was nonoffending. The department also recommended placement with father in Arizona, but requested that an ICPC[1] agreement be in place so that Christina and father could receive services in Arizona.

Mother's attorney then raised the issue of the UCCJEA for the first time and argued that the Arizona court had exclusive jurisdiction over matters relating to Christina's custody. The juvenile court appeared frustrated that the issue was being raised so late. The court stated that it would proceed to disposition and then call the judge in Arizona and if the judge wanted jurisdiction over the matter, the juvenile court would vacate all of its orders.

The juvenile court acknowledged that Christina did not want to live with father, but found that doing so would not be detrimental to her. The juvenile court ordered Christina released from foster care to father in Arizona under the department's supervision with family maintenance services for father and reunification services for mother. The court indicated that it would review the matter after Christina had spent the summer with father in Arizona.

### Contact with Arizona Court

On May 9, 2012, the juvenile court, with all counsel present, indicated that it had spoken to Judge Terry Chandler in Pima County, Arizona, who sanctioned having the matter heard in California. According to the juvenile court, Judge Chandler indicated that she personally had not yet presided over the matter, and she determined the case should be handled in California given the length of time Christina and mother had resided here and that the juvenile court was in a better position to hear the case. However, Judge Chandler would maintain the family law case. The juvenile court confirmed the

---

[1]     ICPC refers to the Interstate Compact for the Placement of Children and establishes a uniform system for the interstate placement of children. All 50 states have adopted some form of the ICPC. (Lance, Case Note: *Child Custody* (1996) 34 U. Louisville J. Fam. L. 781; Fam. Code, § 7901 et seq.)

conversation by e-mail and had copies of the e-mail for the parties. The e-mail is not included in the appellate record. Mother's attorney objected because the conversation with Judge Chandler had not been transcribed as he had previously requested. The juvenile court responded that transcription was not required.

On May 10, 2012, mother filed a writ petition challenging the juvenile court's orders for lack of jurisdiction under the UCCJEA. This court issued a stay, received and considered preliminary oppositions and a supplemental letter from mother, then vacated the stay order and summarily denied the writ petition. Mother then filed this appeal.

## DISCUSSION

### I. The UCCJEA

The UCCJEA is the exclusive method for determining the proper forum in custody disputes involving other jurisdictions, including juvenile dependency proceedings. (Fam. Code, §§ 3421, subd. (b), 3402, subd. (d); *In re Stephanie M.* (1994) 7 Cal.4th 295, 310.) The purpose of the UCCJEA is to avoid jurisdictional competition and conflict, promote interstate cooperation, litigate custody where the child and family have the closest connections, discourage continuing litigation over custody, deter abductions and unilateral removal of children, avoid relitigation of another state's custody decisions, and promote the exchange of information and other assistance between courts of different states. (*Kumar v. Superior Court* (1982) 32 Cal.3d 689, 695.) California adopted the UCCJEA in 2000. (*In re Nada R.* (2001) 89 Cal.App.4th 1166, 1173.) Arizona adopted the UCCJEA effective 2001. (*Welch-Doden v. Roberts* (2002) 202 Ariz. 201, 208 [42 P.3d 1166]; Ariz. Rev. Stat., §§ 25-1001–1067.)

The UCCJEA provides four bases for jurisdiction. (Fam. Code, § 3421, subd. (a).) As relevant here, a child's home state, defined as the state in which the child lived with a parent or person acting as a parent for at least six consecutive months immediately before the child custody proceeding was commenced, has jurisdiction to make an initial child custody determination. (Fam. Code, §§ 3402, subd. (g), 3421, subd. (a)(1); *In re Marriage of Nurie* (2009) 176 Cal.App.4th 478, 491; Ariz. Rev. Stat., § 25-1031, subd.

(A)(1).) "Initial determination" is defined as "the first child custody determination concerning a particular child." (Fam. Code, § 3402, subd. (h).)

The state court that makes the initial child custody determination has exclusive, continuing jurisdiction until either (1) a court of the decree state "determines that neither the child, nor the child and one parent, nor the child and a person acting as a parent have a significant connection with [the] state and that substantial evidence is no longer available in [the] state concerning the child's care, protection, training, and personal relationships," or (2) a court of the decree state or a court of another state "determines that the child, the child's parents and any person acting as a parent do not presently reside in [the decree] state." (Fam. Code, § 3422, subd. (a)(1); Ariz. Rev. Stat., § 25-1032, subds. (A)(1), (2); see *Graham v. Superior Court* (2005) 132 Cal.App.4th 1193, 1200 [concluding that "the original state retains continuing exclusive jurisdiction as long as the parent who is exercising visitation rights still lives in that state and the relationship between that parent and the child has not deteriorated to the point at which the exercise of jurisdiction would be unreasonable"]; accord, *In re Marriage of Nurie, supra*, 176 Cal.App.4th at p. 510.)

A California court may not modify another state's custody order unless the California court has jurisdiction to make an initial custody determination under Family Code section 3421, subdivision (a)(1), and either the decree state determines that it no longer has exclusive, continuing jurisdiction under Family Code section 3422, or that California is a more convenient forum under Family Code section 3427, or a California court or a court of the decree state determines that the child and the child's parents do not presently reside in the decree state. (Fam. Code, § 3423.)

A California court may exercise temporary emergency jurisdiction over a child who is present in the state and has either been abandoned or is in need of emergency protection from mistreatment or abuse. (Fam. Code, § 3424, subd. (a).) However, the finding of an emergency to justify assertion of emergency jurisdiction may only be made after an evidentiary hearing. (*In re Jorge G.* (2008) 164 Cal.App.4th 125, 132.) Where there is a prior child custody determination by another state that is entitled to be enforced,

8

California's emergency jurisdiction may only last long enough for the court with proper jurisdiction to make a permanent order. (Fam. Code, § 3424, subd. (c); *In re A.C.* (2005) 130 Cal.App.4th 854, 863.) Thus, an order finding a basis for emergency jurisdiction must specify an end date for exercise of temporary jurisdiction. (Fam. Code, § 3424, subd. (c).) Moreover, a California court's assumption of emergency jurisdiction does not give it authority to make jurisdictional findings or a permanent custody determination. (*In re C.T.* (2002) 100 Cal.App.4th 101, 108.)

When a California court is asked to make a custody determination and is aware that a sister state custody order exists, it "shall immediately communicate with the other court." (Fam. Code, § 3424, subd. (d).)[2] "Immediately" has been interpreted to mean as soon as possible after the court learns of the child custody proceedings in the other state. (*In re C.T., supra*, 100 Cal.App.4th at p. 110.) The juvenile court may not wait until after it assumes emergency jurisdiction nor until after the jurisdictional hearing to contact the decree state court. (*Id.* at p. 111, fn. 9.)

The juvenile court may allow the parties to participate in the communication with the other state's court. If it does not, then the parties "must be given the opportunity to present facts and legal arguments before a decision on jurisdiction is made." (Fam. Code, § 3410, subd. (b); Ariz. Rev. Stat., § 25-1010, subd. (B).) The court is also required to make a record of any communication with the other court about substantive issues. (Fam. Code, § 3410, subds. (c), (d); Ariz. Rev. Stat., § 25-1010, subds. (C), (D).) A "'record' means information that is inscribed on a tangible medium or that is stored in an electronic or other medium and is retrievable in perceivable form." (Fam. Code, § 3410, subd. (e); Ariz. Rev. Stat., § 25-1010, subd. (E).) A memorandum or electronic record made by the court after the communication has occurred is generally acceptable. (See *In re C.T., supra*, 100 Cal.App.4th at p. 112.)

---

[2]     Likewise, when a California court has asserted emergency jurisdiction, it "shall immediately communicate with the court of [the decree] state to resolve the emergency, protect the safety of the parties and the child, and determine a period for the duration of the temporary order." (Fam. Code, § 3424, subd. (d).)

**II. The California Juvenile Court Lacked Jurisdiction to Make Jurisdictional Findings and the Disposition Order**

The Arizona family court made the initial child custody determination regarding Christina in 1997. Because Christina was born in Arizona and had lived there for 11 months at the time the initial determination was made, Arizona was Christina's home state. The Arizona court also issued a modified custody order in 2006. Thus, the Arizona court had exclusive continuing jurisdiction under the UCCJEA to resolve all future custody issues regarding Christina until such time as the determination was made that Arizona's jurisdiction was no longer reasonable. (Fam. Code, § 3422, subd. (a); Ariz. Rev. Stat., § 25-1032, subd. (A).) "The relevant inquiry, however, is not which jurisdiction has the most evidence or the most significant connection to the minor, but whether [the decree court] has so thoroughly lost connection that an exercise of its jurisdiction would be 'unreasonable.'" (*In re Marriage of Nurie, supra*, 176 Cal.App.4th at p. 511, citing *Grahm v. Superior Court, supra*, 132 Cal.App.4th at p. 1200.)

The Arizona family court granted custody of Christina to mother and visitation rights to father. Because the California juvenile court did not have jurisdiction to make the initial custody determination, it did not have authority to modify the Arizona court's custody order. (Fam. Code, § 3423.) "'[S]ubject matter jurisdiction either exists or does not exist at the time the action is commenced' [citations] and cannot be conferred by stipulation, consent, waiver, or estoppel [citations]." (*In re A. C., supra,* 130 Cal.App.4th at p. 860.)

While the Arizona family court eventually ceded jurisdiction to California, the problem here is that it did so *after* the California juvenile court had already made jurisdictional findings and the disposition order. Because Arizona had not declined jurisdiction prior to the jurisdictional and dispositional hearings, the California juvenile court lacked jurisdiction to make the jurisdictional findings and disposition order. (Fam. Code, § 3423; *In re C.T., supra,* 100 Cal.App.4th at pp. 108–109.)

The California juvenile court was on notice that Arizona had jurisdiction over

10

custody from the beginning of this case. The detention report mentioned the Arizona family law matter. At the pretrial resolution conference, the department provided the court with copies of the Arizona court's 1997 and 2006 minute orders regarding custody and visitation. The Arizona family law case was also mentioned repeatedly throughout the proceedings. Nevertheless, the juvenile court did not attempt to contact the Arizona court until after it had completed the lengthy jurisdictional and dispositional hearings and made jurisdictional findings and the disposition order. The juvenile court erred in not contacting Arizona immediately after the detention hearing.

Although the California juvenile court had authority to assume temporary emergency jurisdiction, it never held an evidentiary hearing to determine whether emergency jurisdiction was warranted. The only evidentiary hearings held were the jurisdictional and dispositional hearings. But "the hearing to determine whether an emergency exists under the [UCCJEA] is a procedure separate and distinct from a section 300 jurisdictional hearing." (*In re C.T., supra*, 100 Cal.App.4th at p. 109; *In re A.C., supra*, 130 Cal.App.4th at p. 864 ["The jurisdictional hearing does not qualify as the hearing authorized by the [UCCJEA]"].) While both hearings often involve similar evidence and issues, the juvenile court lacks the statutory authority to conflate the two hearings. (See *ibid*.) Moreover, the California juvenile court never specified an end date for the exercise of temporary jurisdiction. (Fam. Code, § 3424, subd. (c).) Nor did the juvenile court ever treat the case as being temporary.

A court that lacks subject matter jurisdiction has no power to hear or determine the case and any judgment or order rendered is void on its face. (*Varian Medical Systems, Inc. v. Delfino* (2005) 35 Cal.4th 180, 196.) If jurisdictional error has occurred, the resulting judgment or order is void and reversible on appeal even where it is clear from the record that no prejudice resulted. (*In re Marriage of Jackson* (2006) 136 Cal.App.4th 980, 997.)

11

## DISPOSITION

The jurisdictional findings and disposition order are reversed and the juvenile court is directed to vacate these findings and order.  Any further matters regarding custody are to be raised in Arizona unless the Arizona family court declines jurisdiction. As the decree state, Arizona has "sole power to decide whether jurisdiction has been lost."  (*In re Marriage of Nurie, supra,* 176 Cal.App.4th at p. 510; Fam. Code, § 3422; Ariz. Rev. Stat., § 25-1032.)

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, Acting P. J.
ASHMANN-GERST

We concur:


_____, J.
CHAVEZ


_____, J.[*]
FERNS

---

[*]     Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.